Filed 1/23/25  P. v. Estrada CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RICARDO ESTRADA, <br><br> Defendant and Appellant. | B333577 <br><br> (Los Angeles County Super. Ct. No. VA151209) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph R. Porras, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Ricardo Estrada guilty of two counts of attempted deliberate and premeditated murder (Pen. Code,[1] §§ 187, subd. (a) & 664; counts 1 and 2), one count of shooting at an occupied motor vehicle (§ 246; count 3), and one count of first degree murder (§ 187, subd. (a), count 4).  As to count 4, the jury found true the allegation that Estrada personally discharged a firearm, killing the victim (§ 12022.53, subd. (d)), and the aggravating circumstance that he was armed with and used a weapon within the meaning of Rules of Court rule 4.421, subdivision (b)(2).  As to all four counts, the jury found true aggravating circumstances pursuant to Rules of Court rule 4.421, subdivisions (a)(1), (a)(8), and (b)(1).

On appeal, Estrada contends that the trial court:  (1) abused its discretion and violated due process by admitting gang evidence, (2) abused its discretion by denying his motion for mistrial, (3) erred by refusing to instruct regarding the testimony of an in-custody informant, and (4) abused its discretion by refusing to dismiss the firearm enhancement in count 4.

We affirm the judgment.

## FACTS

### A.    *M.M. and J.R. (Counts 1-3)*

On May 25, 2018, at about 7:00 p.m., M.M. was driving on 166th Street with his brother J.R., on their way to their cousin's house.  A car approached the driver's side and the people in the car yelled things in English that M.M., a Spanish speaker, did

---

[1] All further statutory references are to the Penal Code.

not understand.  M.M. saw a weapon.  He feared for his life, so he drove past his cousin's house, got onto the freeway, and went to a sheriff's station.

M.M.'s cousin, J.A., was waiting for M.M. and J.R. at his house near Harvard Drive and Gard Avenue.  J.A. saw M.M.'s car drive past quickly, followed by a KIA Soul.  He heard gunshots, and saw one shot fired from the KIA.

Los Angeles County Sheriff's Department Deputy Pedro Cruz responded to the scene.  The deputy recovered two .40 caliber bullet casings.  Adrian Ahmed, who lived nearby, approached Deputy Cruz and gave him four more .40 caliber bullet casings that he collected from the area.  Ahmed had gone outside after hearing gunfire.  He found the casings about two blocks from Harvard Drive and Gard Avenue.  Deputy Cruz also discovered what appeared to be the plastic encasement from a car mirror at the scene.

Later, it was determined that all six bullet casings discovered at the scene were .40-caliber.  Deputy Cruz obtained surveillance footage from a house situated on the corner of Harvard Drive and Gard Avenue.  The video showed a vehicle chasing M.M.'s car and included the sound of gunshots.

M.M. and J.R. were unable to identify the shooters, who were wearing hats that covered their faces.  When Deputy Cruz examined M.M.'s vehicle, he noticed the back hatch and the driver's side mirror had been struck by bullets.

## B.    *Jose Felix (Count 4)*

At approximately 7:30 p.m. on the same night, Los Angeles County Sheriff's Department Deputy Daisy Rosales responded to

3

shots fired on Hermosura Street in Norwalk. When she arrived at the scene, Deputy Rosales encountered Jose Felix lying on the sidewalk unconscious. Felix had suffered gunshot wounds to the chest. Felix was transported to the hospital, but died of his injuries.

A neighbor reported that she heard four gunshots and saw a Kia Soul speeding away. Los Angeles County Sheriff's Department Deputy James Potts obtained surveillance camera footage from nearby houses that depicted a greenish brown Kia Soul traveling on Clarksdale Avenue perpendicular to Hermosura at around 7:30 p.m. The Kia had a distinctive green elephant sticker on the bottom left of the rear window. The last three digits on the Kia's license plate were 634. The video depicted a person in the front passenger seat wearing a hat and glasses.

Forensic identification specialist Yvette Gonzalez processed the scene of Felix's murder. Gonzalez recovered two fired bullets, a bullet fragment, and a cartridge casing. She found a bullet impact on a wall five or six feet away from where Felix lay on the ground.

Firearm expert Tracy Peck examined two bullets recovered from Felix's body during the autopsy. One of the bullets recovered from Felix's body was consistent with .40-caliber Smith and Wesson. Peck determined that this bullet and the cartridge case found in the Kia were both manufactured by Glock. The second bullet recovered from Felix's body was consistent with .38-special and .357-magnum caliber cartridges, and was fired from a different gun.

Authorities searched Estrada's house and recovered an expended .38-caliber cartridge casing inside a backpack in Estrada's bedroom.

4

## C.    *The Kia Soul*

Five days later, Deputy Potts spotted a green Kia Soul with an elephant sticker on the rear window and a license plate ending in 634. The Kia's side mirror was damaged, with portions of the trim missing. Deputies determined that Estrada's mother owned the Kia. The car was subsequently impounded, and Estrada's cell phone and his high school identification card were discovered inside the center console. Firearm expert Tracy Peck determined that the damage to the Kia's mirror was caused by a bullet impact. She identified a bullet casing she found under the front passenger seat as a .40-caliber Smith and Wesson cartridge case. Expert Robert Crisafulli processed the Kia for gunshot residue, and discovered 107 characteristic particles present in the vehicle.

## D.    *Additional Ballistics Evidence*

Peck examined the ballistics evidence from both shootings. She concluded that the same Glock pistol was used to fire the six .40-caliber cartridge casings recovered at Harvard Drive and Gard Avenue, the cartridge casing found outside of Felix's house, and the .40-caliber cartridge casing recovered from the Kia. These casings also were all manufactured by Tulammo. Peck was unable to determine whether the .40-caliber bullet recovered from Felix's body was from the same gun as the cartridge casings, but the jacket of the bullet suggested that it was manufactured by Tulammo.

### E.    *Gang Evidence*

Los Angeles County Police Department Detective Tera Frudakis was assigned to Artesia and Norwalk, where she had contact with Chivas gang members and rival Varrio Norwalk gang members.  The two gangs were in an active war over territory, centering on 166th Street, which is the boundary between their territories.  Felix's murder occurred in Varrio Norwalk territory, and the attempted murders of M.M. and J.R. occurred within contested territory.  Although neither gang controlled the contested territory, both gangs tried to keep the other from gaining a foothold there.

Detective Frudakis testified that generally, associates of a gang hang around with and are trusted by gang members, but they are not yet full members themselves.  Only full members can claim the gang and use their symbols.  Members often get gang tattoos to show their allegiance.  Members "put in work" or commit crimes to gain respect within a gang.  In order for their crimes to be recognized, gang members usually commit them with other gang members who can vouch for what occurs.  Gang members will vouch for each other in front of other members and associates.  Gang members go on "missions" together in which they enter rival territory to shoot rival gang members.

Detective Frudakis knew Jose Ruezga as a member of the Chivas gang.  Ruezga's house was a common Chivas gang hangout.  Detective Frudakis had not met Estrada, but she reviewed photographs of him before the jury and verified that he had several Chivas gang tattoos that only a full-fledged gang member would be permitted to have.  She also verified that Estrada was throwing Chivas gang signs in other photographs

6

that were shown to the jury. Detective Frudakis identified a photograph of Rolando Rodriguez, who was also believed to be involved in the shootings, throwing Chivas gang signs.

## F.    *B.C.'s Testimony*

On November 30, 2018, detectives interviewed B.C., who was in custody on separate charges, and had told authorities he had information on the murder.[2]

B.C. was an associate of the Chivas gang. He was in Chivas gang member Ruezga's front yard when he overheard two Chivas members who he knew by the names "Junior" and/or "Wolfy" and "Twist" arguing. Junior and Twist were wearing dark colored shirts and black hats. Junior had his hat pulled down low and was wearing thick black sunglasses. B.C. saw them putting gloves on. Junior had a .40-caliber Glock "sticking out of his waist." Twist asked Junior why he kept driving by and did not let Twist kill someone when Twist told him to stop the car. Junior responded, "that wasn't a— a gang member that you know—that we were—we were looking at." Twist said, "Let's go back. I got a feeling." Junior and Twist then left in Scion or a Kia. Twist was driving. Twist had been driving the car for a week and previously said it belonged to his mother.

B.C. knew that Junior and Twist committed the murder because he heard a "whole commotion with the helicopters," soon afterwards. For a few weeks prior to the murder there had been "drive-by's going back and forth" between Varrio Norwalk and

---

[2] B.C. testified at trial that he did not recall much of what he said in the interview. An audio recording of the interview was played for the jury.

Chivas.  B.C. left Ruezga's yard "after new word got around" that night because "the first thing that came in my mind is those guys are gonna come back here and retaliate."  A few days later, B.C. was in Ruezga's front yard again and overheard Junior telling another gang member that he buried the murder weapon in the park.  In another conversation the same week, Junior or Twist said " 'Are you sure it wasn't me who hit him?' "  The other responded, " 'No.' "  Junior said, "I'm the one who left off first.  I got him.  And then, you got off once I already, you know—you know, shot him."  They bragged that they caught the victim as he was leaving his house.  Junior said they had to get rid of the Glock .40.

B.C. knew that the person who was killed was a gang member from Norwalk, but he did not know the person's name.  B.C. did not think that Junior and Twist knew the victim—they were just trying to shoot any Varrio Norwalk gang member they could find.

B.C. did not know what type of gun was used in the murder in addition to the Glock, but about a month earlier he had seen Twist with a "snub-nosed" Smith and Wesson ".38 Special" revolver.

When the detectives showed B.C. a photo of the Kia, B.C. said that it looked exactly like Twist's mother's car.  When they showed him a photo of Estrada, B.C. identified him as Twist.  B.C. identified a photo of Rodriguez as Junior/Wolfy.

One of the detectives who interviewed B.C. said he could look into the charges against B.C., but that he could not make any promises.  Before the interview the detective emphasized they were not there to discuss the "pickle" B.C. was in.

8

# DISCUSSION

## A.    *Admission of Gang Evidence*

Estrada contends that the trial court abused its discretion by admitting gang evidence although (1) no gang allegation was charged, (2) the motivation behind the shootings was not relevant to any element of the charged offenses, and (3) motive itself was largely irrelevant to establish identity.  Specifically, Estrada argues that Detective Frudakis's testimony, which tended to show that the shootings were motivated by a violent feud between the Chivas gang and Varrio Norwalk gang, did not tend to show that Estrada was one of the perpetrators—the testimony implicated every Chivas gang member equally.  Estrada further contends that the trial court's admission of the gang evidence violated his right to due process, rendering his trial fundamentally unfair.  The contentions lack merit.

### 1.    <u>Law</u>

"Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  'Relevant evidence is broadly defined as that having a "tendency in reason to prove or disprove any disputed fact that is of consequence" to resolving the case.' [Citation.]" (*People v. Thomas* (2023) 14 Cal.5th 327, 358.)  " ' "A trial court has 'considerable discretion' in determining the relevance of evidence.  [Citation.]  Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." ' [Citation.]

9

Evidence is relevant when it ' " 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 53.)

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).) "Such evidence is admissible [under Evidence Code section 352] even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095 (*Ramirez*).)

We review the trial court's ruling on admission of evidence for abuse of discretion. (*Chhoun*, *supra*, 11 Cal.5th at p. 31.) The trial court abuses its discretion to admit evidence under Evidence Code section 352 when the probative value of the evidence is "far outweighed by its tendency to incite a jury to resolve the issue of guilt or innocence on [an accused's] character rather than on proof of the essential elements of the crime." (*People v. Cardenas* (1982) 31 Cal.3d 897, 906–907, quoting *People v. Bartlett* (1967) 256 Cal.App.2d 787, 793–794.)

" 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily

10

prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230, fn. omitted.)

### 2. <u>Proceedings</u>

The information charged Estrada with gang enhancements pursuant to section 186.22, which the trial court dismissed on defense counsel's motion prior to trial. Subsequently, defense counsel filed a motion in limine requesting that all gang evidence be excluded and arguing that the charges were not predicated on Estrada's gang membership, no gang enhancements were alleged, and the evidence would be more prejudicial than probative and would require an undue consumption of time.

The prosecutor argued to admit as relevant to motive general evidence regarding gang history and territory, symbols, and signs, as well as photographic evidence that Estrada had Chivas gang tattoos and threw Chivas gang signs. Defense counsel countered that without the testimony of a Chivas gang shot-caller who could say that the shootings were committed in retaliation for a prior Varrio Norwalk shooting, any gang-related motive was speculative. The gangs at issue had been rivals for decades, so any suggestion that the rivalry motivated the crimes was speculative and would only impugn Estrada's character. Counsel argued that although video evidence captured Estrada's mother's car leaving the scenes of the crimes, there was no

11

evidence that Estrada was in the car at the time. The jury would likely jump to the conclusion that Estrada was involved in the crimes due to the gang evidence. If the court did admit the gang evidence, counsel urged the court to limit it to evidence that was strictly relevant to the case. The prosecutor agreed that the gang evidence should be limited to motive and that the jury should be so instructed pursuant to CALCRIM No. 1403.

The court ruled the gang evidence was admissible. There were ample facts to suggest that the crimes were gang-related, and the evidence was probative of motive and identity. The evidence served a legitimate purpose and was not being used to "just dirty[] people up" in order to secure a conviction. The court stated it would instruct the jury that its consideration of the gang evidence was limited to motive, and it would limit the content of the gang evidence to topics relevant to Estrada's case. Given the relevance and limitations on the gang evidence, the court did not view its admission as involving confusion or undue consumption of time.

At trial, Detective Frudakis testified regarding the rivalry of the Chivas and Varrio Norwalk gangs and gang culture generally, as detailed above.

The trial court instructed the jury under CALCRIM No. 1403: "You may consider evidence of gang activity only for the purpose of deciding whether: [¶] The defendant had a motive to commit the crimes charged. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

12

### 3. Analysis

Estrada contends that the gang evidence should have been excluded because the prosecution did not charge a gang enhancement and the evidence was not relevant to any element of the charged crimes. We disagree. "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 (*Samaniego*).) " 'A "motive" is defined as a "[c]ause or reason that moves the will and induces the action[,]" "[a]n inducement, or that which leads or tempts the mind to indulge a criminal act." [Citation.] Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation].' [Citation.]" (*People v. Megown* (2018) 28 Cal.App.5th 157, 166.) Evidence of a gang-related motive may be admissible regardless of whether a gang allegation is charged. (*Ramirez*, *supra*, 13 Cal.5th at p. 1095.) " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' " (*Samaniego*, *supra*, at p. 1168.)

In this case, the gang-related motive was highly relevant to identity. It demonstrated that the shootings were not random but rather the result of a violent feud between members of the Chivas and Varrio Norwalk gangs, and that Estrada, as a member of the Chivas gang, had a reason to commit the crimes. The jury did not view the gang evidence in a vacuum. In conjunction with other evidence, the gang evidence tended to

13

establish that Estrada personally committed the crimes. Estrada's motivation to further the gang by shooting a rival gang member combined with the physical evidence—including the evidence tying Estrada to both the vehicle and one of the weapons used in the shootings—tended to show that Estrada, and not some random person, or even some random Chivas gang member, committed the offenses.

Estrada analogizes his case to *People v. Perez* (1981) 114 Cal.App.3d 470, 473 (*Perez*). The two cases are readily distinguishable, however. In *Perez*, the defendant was charged with kidnaping for the purpose of robbery, robbery, and the unlawful taking of a vehicle, which he allegedly committed with another person. (*Id*. at p. 473.) At trial, the victim identified the defendant, who was in the stolen car with him for over 15 minutes. (*Id*. at p. 477.) Afterwards, the prosecution was permitted to introduce evidence of the defendant's gang membership to show that the defendant and another gang member who was allegedly involved in the crimes had associated with each other. (*Id*. at p. 476.) The defendant offered to stipulate that he drove the car in question three days after it was stolen, and that he was acquainted with the other gang member, but the prosecutor rejected the offer. (*Id*. at pp. 478–479.) Although the defendant invoked Evidence Code section 352, the trial court did not weigh the probative value of the evidence against its potential prejudicial effect as required. (*Id*. at p. 478.) The court of appeal held that the gang evidence had no " 'tendency in reason' " to prove the identity of the person who committed the crimes. (*Id*. at p. 477.) Rather, the gang evidence allowed the jury to find the defendant "guilty of the offense[s]

14

charged on the theory of 'guilt by association [with the gang].' "
(*Id.* at p. 477.)

The instant case differs markedly from *Perez*. In *Perez*, there was no evidence that the defendant had a gang-related motive to commit the crimes. The gang evidence was cumulative to the already strong evidence of identity, which was established through the testimony of the victim who observed the defendant during the crime. The gang evidence was not necessary to establish that the two perpetrators were acquainted because the defendant offered to stipulate that he knew the other perpetrator. Moreover, the trial court did not exercise its discretion, as it did not consider the probative value of the gang evidence against its prejudicial effect. In sum, in *Perez* the gang evidence had little probative value and was unduly prejudicial.

Here, the prosecution presented evidence that the shootings were gang-related and had been committed because of a violent feud between Estrada's gang and the Varrio Norwalk gang. There was no other evidence that could explain the motive for the crimes. The motive was relevant to identity—it demonstrated the likelihood that a Chivas gang member was the perpetrator, and together with the physical evidence it tied a specific Chivas member—Estrada—to the crime. The trial court balanced the probative value of the gang evidence against its prejudicial effect and found that it was more probative than prejudicial, and not confusing or cumulative. The court admitted the evidence for the purpose of showing motive and instructed the jury that it was to limit its consideration of the gang evidence to motive and not to consider it as evidence of Estrada's character. The trial court did not abuse its discretion in admitting the gang evidence.

15

Nor did the prosecutor's use of the gang evidence render the trial fundamentally unfair in violation of Estrada's right to due process. Detective Frudakis's testimony provided context for Estrada's actions, which were not explained by other evidence. The gang-related evidence corroborated other evidence of identity that did not pertain to motive. The evidence was highly probative and neither cumulative nor unduly prejudicial. The jury was specifically instructed that it could only consider the evidence as probative of motive, and we presume the jurors understood and followed that instruction. (*Chhoun, supra*, 11 Cal.5th at p. 30.) The gang evidence served legitimate purposes and did not implicate Estrada's right to a fair trial.

**B.** *Motion for Mistrial*

Estrada next contends that the trial court abused its discretion by denying his motion for mistrial because Detective Frudakis referenced the Mexican Mafia during her testimony, which irreparably damaged his ability to obtain a fair trial. Although we agree that the detective's comment had minimal probative value, we reject the contention because this single reference to the Mexican Mafia was not unduly prejudicial and did not irreparably damage Estrada's chances of receiving a fair trial.

1. **Law**

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.]" ' " (*People v. Silveria and Travis* (2020)

16

10 Cal.5th 195, 298.) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' [Citations.] . . . '[a] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' [Citations.] " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) We review the trial court's denial of a motion for mistrial for abuse of discretion. (*Ibid.*)

### 2.    Proceedings

At trial, the prosecutor asked Detective Frudakis to "talk about just gangs in general" and explain the difference between a gang associate and a gang member. Detective Frudakis testified regarding a full-fledged member's initiation into a gang: "the most common thing for Hispanic gangs is to get jumped in for 13 seconds. Now, you're asking why the number 13? The number 13 is because the 13th letter of the alphabet is the letter "M" as in Mary. The reason why gangs, Hispanic gangs, have that number 13 behind their name is because they show allegiance to the Mexican Mafia."

Defense counsel objected that the testimony was irrelevant. The trial court overruled the objection.

Before Detective Frudakis's testimony concluded, defense counsel filed a motion for mistrial arguing that Detective Frudakis presented "rambling and narrative testimony" that was highly prejudicial and inflammatory and went beyond merely establishing motive and intent. The motion noted that Detective Frudakis "made statements about the 'Mexican Mafia', general crimes committed by gang members, and intimidation tactics of

17

gang members." Alternatively, the defense requested that Detective Frudakis's testimony be stricken, that the detective be admonished not to testify in such a manner, or that the court give a curative instruction.

The court denied the motion for mistrial. The court made its rulings during the testimony and did not feel that the testimony was overbroad. The court stated, "The record speaks for itself when it's alleged she made the statement about the Mexican Mafia. It was just explaining the 13, the 13th letter of the alphabet, the 'M', allegiance to the Mexican Mafia. The defense can cross-examine as to any of those issue[s]. Other than that, it was just the general gang culture that she was testifying to, which the court allowed in. The appropriate objections were made at the time. The court ruled on those and so they're preserved." The court stated that it was willing to revisit its ruling, and invited counsel to make any further objections counsel found necessary.

When Detective Frudakis's testimony resumed, she made no further references to the Mexican Mafia.

### 3.      Analysis

The cases that Estrada cites in support of his position that Detective Frudakis's testimony regarding the Mexican Mafia was so prejudicial as to irreparably damage his chances of a fair trial are distinguishable. In *People v. Roof* (1963) 216 Cal.App.2d 222 (*Roof*) and *People v. Bentley* (1955) 131 Cal.App.2d 687 (*Bentley*), witnesses volunteered testimony regarding the defendants' uncharged criminal activity. (*People v. Roof, supra*, at p. 225 [contributing to the delinquency of a minor with the proceeds of

18

the charged crime]; *People v. Bentley*, *supra*, at p. 689 [reference to defendant being a suspect in a separate child molestation case and defendant denying same upon questioning].)  In *People v. Schiers* (1971) 19 Cal.App.3d 102, 108, an officer testified that the defendant failed a lie detector test and that the defendant said the machine must not have been working when told that he failed the test.  In *People v. Navarrete* (2010) 181 Cal.App.4th 828, an officer referenced a statement that the defendant made to him, but then stated that he could not say more because the court had instructed him not to.  All of these cases involved testimony that directly related to the defendant personally and regarded either his criminal conduct or his inferentially self-incriminating statements.  As Estrada acknowledges, courts have found that a trial court's refusal to grant a mistrial was not an abuse of discretion where a witness volunteered brief, less serious comments about a defendant.  (*People v. Collins* (2010) 49 Cal.4th 175, 197 [witness testified defendant made phone call from "Susanville," a state prison]; *People v. Avila* (2006) 38 Cal.4th 491, 574 [witness relayed he was told defendant had just been released from prison, was crazy, and would kill him; court admonished jury to consider only as to codefendant and not for the truth of the matter]; *People v. Bolden* (2002) 29 Cal.4th 515, 554–555 [police officer testified the Department of Corrections parole office his defendant's address].)

Here, Detective Frudakis mentioned the Mexican Mafia once when describing the general practices of Hispanic gangs. Unlike the testimony in *Roof*, *Bentley*, *Schiers*, and *Navarrete*, the detective's testimony was general.  She did not testify regarding anything that would tie Estrada personally to the Mexican Mafia.  To the extent her Mexican Mafia remark related

to Estrada, it applied equally to the murder victim, a gang member whose mother had just testified that he was "jumped in" to Varrio Norwalk.  Detective Frudakis's testimony did not relate to Estrada's conduct or his self-incriminating statements.  Moreover, the jury was specifically instructed under CALCRIM No. 1403 that it could not consider any of the gang evidence as evidence of Estrada's character.  We presume that the jurors understood and followed the trial court's instruction.  (*Chhoun*, *supra*, 11 Cal.5th at p. 30.)  Estrada's chances of receiving a fair trial were not irreparably damaged.  The trial court did not abuse its discretion in denying the motion for new trial.

## C.    *In-Custody Informant Instruction*

Estrada next contends that the trial court erred in refusing to instruct the jurors under CALCRIM No. 336 that B.C. was an in-custody informant.  The contention is without merit.

Section 1127a, subdivision (a) defines an in-custody informant as follows:  "a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution."  Pursuant to section 1127a, subdivision (b), "In any criminal trial or proceeding in which an in-custody informant testifies as a witness, upon the request of a party, the court shall instruct the jury as follows:  [¶] 'The testimony of an in-custody informant should be viewed with caution and close scrutiny.  In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness.

20

This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.' "

CALCRIM No. 336 mirrors the language of section 1127a, subdivision (b). It further instructs: "You may use the (statement/ [or] testimony) of an in-custody informant against the defendant only if: [¶] 1. The (statement/ [or] testimony) is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the (statement/ [or] testimony); AND [¶] 3. That supporting evidence connects the defendant to the commission of the crime[s] [or to the special circumstance/ [or] to evidence in aggravation]. The supporting evidence is not sufficient if it merely shows that the charged crime was committed [or proves the existence of a special circumstance/ [or] evidence in aggravation]."

At trial, defense counsel requested that the court instruct the jury under CALCRIM No. 336 with respect to B.C. The prosecutor expressed his concern that CALCRIM No. 336 was a very narrow exception that did not apply, but averred that the court might need to instruct the jury because defense counsel requested the instruction. The court stated that B.C. did not meet the definition of an in-custody informant. B.C. and Estrada were not in a correctional facility when Estrada and Rodriguez made the statements that B.C. overheard. Applying the exception under such circumstances would improperly stretch the definition of an in-custody informant. The court noted that defense counsel could argue B.C. was not credible if B.C. received some promise or benefit in exchange for his testimony.

Defense counsel agreed that B.C. did not meet the strict definition of an in-custody informant, but argued that the

21

situation fell within the spirit of the legislation.  Counsel proposed that the court modify CALCRIM No. 336 and "instead of calling him an in-custody informant . . . we say he is an informant who was in custody at the time of the cooperation or the informing . . . ."  The court declined to give CALCRIM No. 336 or the proposed modification, explaining that an important aspect of the instruction was that it did not permit the jury to convict based on the in-custody informant's testimony alone, and thus did not apply to a witness who did not meet the definition of in-custody informant.  CALCRIM No. 226, which instructed on the credibility and believability of witnesses, would address any concerns with B.C.'s testimony.

The trial court did not err in refusing to give CALCRIM No. 336.  B.C. was a percipient witness who was later incarcerated and approached authorities with information regarding the crimes.  In addition to overhearing Estrada and Rodriguez's conversation, he saw them leave in Estrada's mother's car, which he had seen Estrada driving the week before the murder.  Soon after B.C. saw Estrada and Rodriguez leave in the Kia, B.C. heard helicopters that he associated with a shooting.

In *People v. Bivert* (2011) 52 Cal.4th 96, 120–121, our Supreme Court discussed CALJIC No. 3.20, the predecessor of CALCRIM No. 336, and distinguished a situation like the one before us with that of an in-custody informant:  "An examination of the legislative history of section 1127a, which was enacted in 1989 and formed the basis for cautionary instruction CALJIC No. 3.20, reveals the Legislature made a deliberate and rational distinction between in-custody *percipient* witnesses and in-custody *informant witnesses*. . . .  The Legislature recognized that

in-custody informant witnesses differ in nature and character from in-custody percipient witnesses. Section 1127a and CALJIC No. 3.20 specifically distinguish between the two. In-custody informant witnesses have no personal knowledge of the crime, but testify that a defendant made an inculpatory statement to them while in proximity in a county jail or state prison, often in exchange for favorable treatment by law enforcement. In-custody percipient witnesses, by contrast, like other percipient witnesses, codefendants, accomplices, and coconspirators, testify on the basis of personal knowledge of the crime." Giving CALCRIM No. 336 in connection with the testimony of a percipient witness who happened to later be incarcerated would contravene section 1127a, subdivision (a), which specifically excludes a percipient witness from the definition of an in-custody informant. (See *id*.)

Additionally, in this case the trial court addressed any concerns regarding B.C.'s credibility by giving CALCRIM No. 226, which instructs the jury to consider whether a witness has engaged in conduct that reflects on his believability, whether a witness has been convicted of a felony, and whether the witness was promised leniency or immunity in exchange for their testimony, as well as CALCRIM No. 316, which specifically instructs that the jury may consider whether a witness has been convicted of a felony when assessing credibility.

### D.    *Section 12022.53 Enhancement*

Finally, Estrada contends that the trial court abused its discretion by refusing to dismiss the 25 years to life firearm enhancement attached to the murder conviction in count 4.

23

"Section 1385, subdivision (c)(1), as added by Senate Bill No. 81 [(Stats. 2021, ch. 721, § 1)], provides that '[n]otwithstanding any other law, the court *shall dismiss an enhancement if it is in the furtherance of justice to do so*, except if dismissal of that enhancement is prohibited by any initiative statute.' (Italics added.) Section 1385, subdivision (c)(2) provides in pertinent part, '*In exercising its discretion under this subdivision*, the court shall consider and *afford great weight* to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances *weighs greatly in favor of dismissing the enhancement*, unless the court finds that dismissal of the enhancement would endanger public safety.' (Italics added.)" (*People v. Walker* (2024) 16 Cal.5th 1024, 1032 (*Walker*).) Section 1385, subdivision (c)(2)(C) lists as one circumstance that: "[t]he application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed."

As Estrada concedes, the Courts of Appeal are in agreement that the "shall be dismissed" language of section 1385, subdivision (c)(2)(C) does not require trial courts to dismiss every enhancement of 25 years to life imposed pursuant to section 12022.53, subdivision (d). (See *People v. Hiller* (2023) 91 Cal.App.5th 335, 351; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 290–293; *People v. Cota* (2023) 97 Cal.App.5th 318, 335; *People v. Renteria* (2023) 96 Cal.App.5th 1276, 1286–1287; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21.) Previously, however, there was a split of authority regarding whether the "shall be dismissed" language created a rebuttable presumption that dismissal of the enhancement is in the interests of justice

24

unless the court finds that dismissal of the enhancement would endanger public safety. (*Walker*, *supra*, 16 Cal.5th at p. 1029 [recognizing split of authority].)

After the opening brief was filed, but before the filing of the respondent's brief and the reply brief, our Supreme Court decided the issue adversely to Estrada's position that the "shall be dismissed language" creates a rebuttable presumption in favor of dismissal.[3] The *Walker* court held that "the plain language of section 1385, subdivision (c)(2) does not erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety[.]" (*Id*. at p. 1033.) " '[T]he ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement' [citation] and this 'furtherance of justice' (§ 1385, subd. (c)(1)) inquiry requires a trial court's ongoing exercise of 'discretion' (*id*., subd. (c)(2)). Thus, notwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.' " (*Ibid*.)

Estrada's construction of the statute is contrary to Supreme Court precedent, so the trial court could not have erred in the manner Estrada contends that it did. Absent some contrary indication in the record, we presume that a trial court understood and properly exercised its discretion. (See *People v. Lee* (2017) 16 Cal.App.5th 861, 867 ["if the record is silent" on the court's awareness of its discretionary authority in sentencing, we must presume the court understood the scope of its discretion and

---

[3] The parties disagree as to whether Estrada's claim has been preserved for appeal. For the purposes of argument, we presume, without deciding, that his claim was not forfeited.

affirm]; *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 ["in light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, [the reviewing court] cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of [its] discretion"].)  On this record, there is nothing to indicate that the trial court did not understand its discretion.

To the contrary, the record demonstrates that the trial court understood and appropriately exercised its discretion.  Prior to trial, defense counsel filed a motion requesting that the court dismiss the section 12022.53, subdivision (d) enhancement pursuant to section 1385, subdivision (c)(2)(C) because imposition of the 25 years to life enhancement would result in a sentence of greater than 20 years.  The trial court declined to decide the motion prior to trial, but discussed the substance of the motion with the parties at that time.  Subsequently, the jury found true multiple aggravating circumstances relevant to sentencing.  As to all four counts, the jury found that the crimes "involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness[,]" "the manner in which the defendant carried out [the offenses] . . . indicates planning, sophistication, and professionalism[,]" and "the defendant engaged in violent conduct that indicates a danger to society[.]"  (Cal. Rules of Court, rule 4.421, subds. (a)(1), (a)(8), & (b)(1).)  As to the murder in count 4, the jury found that Estrada was armed with and used a weapon within the meaning of Rules of Court rule 4.421, subdivision (b)(2).

The trial court considered Estrada's youth and his troubled childhood at the sentencing hearing, but found these factors did not outweigh Estrada's violent conduct such as to warrant imposition of a lesser sentence. The facts in the record indicate that the court was aware of its discretion and determined that it was not in the interest of justice to dismiss the section 12022.53, subdivision (d) enhancement. Nothing suggests otherwise. We cannot conclude that the trial court abused its discretion.

## DISPOSITION

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.


MOOR, J.


WE CONCUR:



BAKER, Acting, P. J.



KIM (D.), J.